IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

COMPETITIVE CARRIERS OF THE
SOUTH, INC., et al.,

      Plaintiffs,

v.

LISA POLAK EDGAR, et al.,

      Defendants.
_____/

CONSOLIDATED CASES
NO. 4:07cv48-RH/WCS and
NO. 4:07cv64-RH/WCS

## ORDER ON MERITS

The Telecommunications Act of 1996 requires an incumbent local exchange carrier ("ILEC") to provide a competitive carrier access to the ILEC's unbundled network elements under specified circumstances. The issue in these consolidated cases is the validity of an order of the Florida Public Service Commission allowing two ILECs to increase the price of access to one such element—the local loop—to compensate for extraordinary costs the ILECs incurred as a result of an unprecedented series of hurricanes. I uphold the order.

# I
# Background—The Statutory Framework

Historically, local telephone service was provided in the United States on a monopoly basis by carriers regulated under state law by state public service commissions. Congress fundamentally changed that approach by enacting the Telecommunications Act of 1996. *See* 47 U.S.C. §§ 251 et seq. The Act imposes on ILECs, as a matter of federal law, various duties designed to foster competition. The Act allows state commissions the option of taking a major role in implementing the Act's requirements.

The federal duties imposed on each ILEC—ordinarily a carrier who previously provided local service on a monopoly basis—include the obligation to sell local services at wholesale to any competing carrier for resale by the competing carrier to customers; the obligation to allow competitors to interconnect with the ILEC's facilities for the purpose of providing services to the competitor's own customers; and, of importance in the case at bar, the obligation to make certain "network elements"—parts of the ILEC's telecommunications system—available to competing carriers for their use in providing service to their own customers. The Act directs the Federal Communications Commission ("FCC") to determine which network elements must be made available to competitors and to consider, in making that determination, whether access to

proprietary network elements is "necessary" and whether the failure to provide access would "impair" the ability of the competitive carrier to provide services. 47 U.S.C. §251(d)(2). One network element that must be made available is the "local loop" that connects a customer to the ILEC's wire center.[1]

## II
## Background—The Case at Bar

The 2004 and 2005 hurricane seasons were the worst in Florida history. After the 2004 season, the Florida legislature enacted § 364.051(4)(b), Florida Statutes. The statute authorizes the Florida Public Service Commission to provide for an ILEC to impose a charge of up to 50 cents per month per customer line, for a maximum of 12 months, in order to recover extraordinary intrastate costs incurred as a result of hurricanes and other named storms. The statute authorizes imposition of the charge not only on the ILEC's own customers but also on competitive carriers who purchase access to the ILEC's local loops.

---

[1] These duties are described in greater detail in an ever growing list of judicial decisions. *See, e.g.*, *AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 119 S. Ct. 721, 142 L. Ed. 2d 835 (1999); *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 112 F. Supp. 2d 1286 (N.D. Fla. 2000). Indeed, portions of this order are nearly identical to analogous portions of earlier orders of this court. A comprehensive but now somewhat dated review of FCC and judicial interpretations of the "necessary and impair" standard is set forth in *In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 19020 (2003).

*Consolidated Case No. 4:07cv48-RH/WCS*

After the 2005 season, the Florida Commission exercised its authority under § 364.051(4)(b) to allow the two ILECs involved in these consolidated cases—defendants BellSouth Telecommunications, Inc., and Embarq Florida, Inc.—to impose a 50-cent-per-line charge for 12 months in order to recover a portion of the extraordinary intrastate costs they incurred as a result of the storms that hit Florida in that year.

The Florida Commission's approval of the 50-cent charge led to the filing of these now-consolidated cases. In Case No. 4:07cv48, a competitive carrier (Florida Digital Network, Inc.) and a not-for-profit corporation whose members are competitive carriers (Competitive Carriers of the South, Inc.) seek declaratory and injunctive relief against BellSouth and members of the Florida Commission in their official capacities. In Case No. 4:07cv64, another competitive carrier (NuVox Communications Inc.) and Competitive Carriers seek declaratory and injunctive relief against Embarq and members of the Florida Commission in their official capacities. In both cases, the plaintiffs claim that federal law, specifically the Telecommunications Act of 1996 and its implementing regulations, preempts state authority to allow ILECs to recover these costs in this manner.

# III
# Merits

The federal Telecommunications Act of 1996 directs state commissions to set "just and reasonable" prices for network elements "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the . . . network element."  47 U.S.C. § 252(d)(1).  The FCC has determined that prices must be based on total element long-run incremental cost ("TELRIC"), a forward-looking methodology that takes into account the cost that would be incurred by an efficient carrier using the best available technology and operating from the ILEC's existing wire centers.  *See* 47 C.F.R. §51.505.  The Supreme Court has upheld the FCC's adoption of this methodology.  *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002).

In accordance with these authorities, prior to the hurricanes, BellSouth and Embarq were charging competitive carriers TELRIC-based prices for access to local loops.  The 50-cent-per-line monthly charge, however, is *not* TELRIC-based.  The 50-cent charge is based on costs these ILECs incurred in the past, not on costs an efficient carrier would incur in the future.  The 50-cent charge thus looks back, not forward as required by the TELRIC methodology.

The plaintiffs assert that because the 50-cent charge is not based on

TELRIC, it violates federal law.  The defendants acknowledge that the 50-cent charge is not based on TELRIC, but they assert that federal law does not prohibit charges of this type.  The defendants have it right.

The Telecommunications Act of 1996 requires an ILEC to make an unbundled network element available to a competitor if specified conditions are met.  The Act, as authoritatively implemented by the FCC, goes further and requires the ILEC to provide the network element not based on historic cost but at the cost an efficient carrier would incur to provide the element over the long run.  Nothing in this scheme, however, suggests that an ILEC must go still further and provide a network element at a price *below* the cost an efficient carrier would incur over the long run.  It would be difficult to articulate a rationale that would support such a requirement.

Providing the network element at a price below cost—below the cost an efficient carrier would expect to incur over the long run and below the cost these carriers in fact have incurred—is essentially what the plaintiffs demand in the case at bar.  In determining their pre-hurricane TELRIC-based rates, BellSouth and Embarq did not include the cost an ILEC would expect to incur to deal efficiently with the worst hurricane season ever.  Had they attempted to do so, the Florida Commission and these plaintiffs undoubtedly would have balked.  But the worst hurricane season came, and these carriers incurred extraordinary costs as a result.

*Consolidated Case No. 4:07cv48-RH/WCS*

The plaintiffs have questioned not a whit the necessity of the work these ILECs did to restore their networks nor the reasonableness of the costs they incurred. Even so, the plaintiffs assert the ILECs are stuck with their pre-hurricane rates and can never recover the hurricane-related costs. This makes no sense.

Any forthright assertion that an ILEC cannot include extraordinary hurricane-related costs in forward-looking rates set in advance, and also cannot recover the costs after they are incurred, would be hard to maintain. And the plaintiffs do not try. Instead, they say, albeit with some equivocation, that anticipated costs could be included in TELRIC-based rates set in advance. And indeed they could. Actuaries determine the likelihood of calamities of all types and the costs they can be expected to inflict. Insurers use actuarial projections to set premiums for covering such risks. ILECs could include an appropriate amount in their TELRIC-compliant rates, based either on the premiums an efficient ILEC would pay to insure these risks or the (presumably roughly equivalent) costs an efficient, self-insured ILEC could expect to incur over the long run.

But this is not how the TELRIC methodology has been implemented. The TELRIC methodology simply has not addressed extraordinary costs of this nature, and nothing in federal law specifically requires it. To the contrary, it makes sense to do it the way it has been done, excluding worst-hurricane-season-ever type costs from the TELRIC-based rates but allowing the recovery of such truly extraordinary

costs on the back end.

This conclusion is fully consistent with the governing statutes and regulations.  Under 47 U.S.C. § 253(a), a state cannot take action that prohibits or has the effect of prohibiting any entity from providing telecommunications service.  But the provision does not limit the state's authority to act in ways relevant in the case at bar.  Thus § 253(b) provides:

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis . . ., requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

In context, § 253(b) plainly authorizes a state to act, or at least recognizes a state's preexisting authority to act, for the prescribed purposes.

The Florida Commission's approval of the 50-cent-per-line charge easily comes within its § 253(b) authority.  As any Floridian well knows, telephone service is a critical component of coping with hurricanes.  The restoration of telephone service following a storm is essential to "protect the public safety and welfare."  Prompt restoration of service is a more important aspect of the "quality of telecommunications services" than occasional static on the line, and the "rights of consumers" are probably never more in doubt than in the early days following a storm.  Finally, while "universal service" is a constant goal, it is probably never more threatened, or more important, than in the wake of a storm.

The plaintiffs suggest that the Florida Commission did not squarely invoke these provisions. But the issue here is not how well the Commission identified the federal authority for its action, but whether it *had* the authority. It plainly did. Moreover, the Florida Commission was undoubtedly aware of the importance of restoring telephone service after a storm—of the impact on public safety and welfare and on the rights of consumers, and of the need for universal service of sufficient quality. Only an uncommonly obtuse Floridian would not have understood this after the 2004 and 2005 hurricane seasons.

To be sure, the 50-cent-per-line charge did not itself restore telephone service. The ILECs restored the service as quickly as possible and sought to impose the charge after the fact. One hopes they would act in the public interest even if told they would never recover the cost. But the Florida Commission's authority under § 253(b) is broad enough to encompass not only an order requiring ILECs to restore service promptly after a storm, but also an order providing compensation for doing so. The statute providing a compensation mechanism was in place before the ILECs acted, and the availability of compensation in appropriate circumstances will provide an incentive for the ILECs to act in the public interest again if the occasion arises.

The Florida Commission thus had authority to impose the 50-cent-per-line charge so long as the charge was, in the words of § 253(b), "competitively

neutral." This is the linchpin of state authority in this area. A goal of the Telecommunications Act of 1996 is to foster competition in the local telecommunications market. This is why, in appropriate circumstances, a competitive carrier is afforded access to an ILEC's unbundled network elements. For a charge of the type here at issue to be consistent with the goal of fostering competition, it must be "competitively neutral," favoring neither the ILEC nor the competitor.

The charge at issue here easily meets this standard. Under the Florida Commission order, the affected ILECs charge their own customers 50 cents per line per month for 12 months, and for access to the local loop, they charge competitive carriers the same 50 cents per line per month for 12 months. This is precisely neutral, giving neither the ILECs nor the competitive carriers any relative advantage or disadvantage as they compete for customers.

If, in contrast, the competitive carriers were to prevail in this action, they would gain an unfair competitive advantage—the ability to sell local service at 50 cents per line per month cheaper than the ILECs, based not on skill, foresight, and industry, but based instead only on an artificial regulatory construct. This would conflict with the goal of the Telecommunications Act, which is to foster competition by leveling the playing field for the competitive carriers, not to distort competition by giving them an unfair and artificial advantage.

*Consolidated Case No. 4:07cv48-RH/WCS*

The conclusion that the hurricane charge is consistent with federal law also draws support from the treatment by Congress and the FCC of an analogous extraordinary cost incurred by ILECs. The Telecommunications Act requires "number portability," under which a customer may change carriers but maintain the same telephone number. The Act provides that the cost of implementing this mandate must be "borne by all telecommunications carriers on a competitively neutral basis as determined by the [FCC]." 47 U.S.C. § 251(e)(2). The FCC has determined that this cost properly should be recovered by ILECs from competitive carriers through a separate charge, not rolled into TELRIC-based rates. *See In re Telephone Number Portability*, 17 F.C.C.R. 2578, 2607-08 (2002). While there are differences between hurricane costs and number portability costs, the underlying issues relating to how these costs should be recovered are the same: these are extraordinary costs best handled by a competitively neutral separate charge rather than by some enormously imprecise attempt to incorporate them into forward-looking TELRIC-based rates.

### IV
### Conclusion

Acting under authority explicitly granted by the Florida legislature, the Florida Commission provided a competitively neutral mechanism for the defendant

ILECs to recover some of the costs they reasonably incurred to restore service after the worst hurricane season in history. The plaintiffs—competitive carriers who provide service using the ILECs' network elements—seek to invalidate the charge imposed on them, but not the equal charge imposed on the ILECs' own customers, and thus to gain an unfair and artificial competitive advantage. Their assertion that federal law requires this result is incorrect. To the contrary, 47 U.S.C. § 253(b) squarely authorizes imposition of a competitively neutral charge that protects the public safety and welfare and promotes the public interest in other specified respects, as this charge plainly does. Accordingly,

    IT IS ORDERED:

    The clerk must enter judgment in each of these cases stating, "The plaintiffs' claims are dismissed with prejudice." The clerk must close the files.

    SO ORDERED on October 16, 2008.

                                  s/Robert L. Hinkle  
                                  Chief United States District Judge